UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARCELLA DIVIACCHI,
Individually and on Behalf
Of Similarly Situated Persons,
    Plaintiff,


     v.                                                CIVIL ACTION NO.
                                     14-10283-IT

AFFINION GROUP, INC., d/b/a
AFFINION BENEFITS GROUP LLC,
AFFINION GROUP, and AFFINION GROUP
HOLDINGS INC., Individually,
CENTURY BANK & TRUST COMPANY,
Individually and as Class
Representative of Similarly
Situated Entities,
    Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO**
**FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6)**
**(DOCKET ENTRY # 12)**

**March 11, 2015**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss filed by

defendants Century Bank & Trust Company ("Century Bank") and

Affinion Group, Inc., d/b/a Affinion Benefits Group LLC, Affinion

Group, and Affinion Group Holdings Inc., ("Affinion")

(collectively "defendants") under Fed.R.Civ.P. 12(b)(6) ("Rule

12(b)(6)").  (Docket Entry # 12).  After conducting a hearing,

this court took the motion (Docket Entry # 12) under advisement.

PROCEDURAL BACKGROUND

Plaintiff Marcella Diviacchi ("plaintiff") filed this action

on February 7, 2014, seeking to recover funds electronically withdrawn from her Century Bank checking account by Century Bank and/or Affinion and its subsidiaries.  The motion seeks to dismiss all counts.  (Docket Entry # 12).

The eight count amended complaint sets out the following causes of action against all defendants unless otherwise noted: (1) violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693a et. seq., for failing to obtain preauthorization of electronic transfers (Count I); (2) conversion (Count II); (3) fraud (Count III); (4) unjust enrichment (Count IV); (5) money had and received (Count V); (6) aiding and abetting against Century Bank (Count VI); (7) violation of section nine of Massachusetts General Laws chapter 93A ("chapter 93A") (Count VII); and (8) equitable relief in the form of an injunction, restitution, rescission and a declaratory judgment (Count VIII). The declaratory judgment seeks a declaration that a membership enrollment (Docket Entry # 9, Ex. E) and similar contracts are "unconscionable."

In addition to these individual claims, plaintiff seeks to represent a class consisting of:

> All persons who were electronically debited fees from a bank checking account for a "Benefits Package" or one of the other Affinion membership programs that are substantively similar to this particular program through the use of a printed "Membership Agreement" or "Membership Enrollment" that is the same or substantively similar to [the one attached to the amended complaint.]

(Docket Entry # 9, ¶ 43(a)).

STANDARD OF REVIEW

The standard of review for a Rule 12(b)(6) motion is well established.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's complaint must include factual allegations that when taken as true demonstrate a plausible claim to relief even if actual proof of the facts is improbable.  Bell Atlantic v. Twombly, 550 U.S. 544, 555-558 (2007).  While "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully."  Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown that the pleader is entitled to relief."  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) (internal quotation marks and citations omitted).  Discarding legal conclusions and taking the facts in the governing complaint as "true and read in a plaintiff's favor even if seemingly incredible," the complaint "must state a plausible, but not a merely conceivable, case for relief."  Sepúlveda–Villarini v. Dept. of Educ., 628 F.3d 25, 29 (1st Cir. 2010).

"Where, as here, dismissal is premised on the running of a statute of limitations," a dismissal is appropriate "only if the

3

facts, so derived and viewed in the requisite perspective, 'leave
no doubt that an asserted claim is time-barred.'" <u>Warren
Freedenfeld Associates, Inc. v. McTigue</u>, 531 F.3d 38, 44 (1st Cir.
2008) (quoting <u>LaChapelle</u>, 142 F.3d at 508); <u>see</u> <u>Abdallah v. Bain
Capital LLC</u>, 880 F.Supp.2d 190, 195 (D.Mass. 2012).  Plaintiff
attaches a number of documents to the amended complaint which are
thereby part of the amended complaint "for all purposes."
Fed.R.Civ.P. 10(c).  When deciding a Rule 12(b)(6) motion to
dismiss, "any inconsistencies between the complaint and the
instrument must be resolved in favor of the latter." <u>Arruda v.
Sears, Roebuck & Co.</u>, 310 F.3d 13, 18 (1st Cir. 2002).

FACTUAL BACKGROUND

Plaintiff immigrated to the United States in 1963 at the age
of 32.  She is literate in her native language of Italian.  She
can "barely" speak English and she can neither read nor write
English.  (Docket Entry # 9, ¶ 14).  In the summer of 1995,
plaintiff moved to the McNamara House, a subsidized elderly
housing facility, in Brighton, Massachusetts.  In late June or
early July 1995, she went to a Century Bank branch located at 300
Western Avenue in Allston, Massachusetts to open a checking
account.  (Docket Entry # 9, Ex. E).

Plaintiff opened a joint account with her son as the co-
owner.  The signatures of plaintiff and her son, who is her
attorney in this action, appear on a signature card.  Underneath

the signatures, the card states that, "If two people sign above, the account is joint . . .." (Docket Entry # 9, Ex. E).

Plaintiff was asked for and provided the "usual account opening information such [as] a name, address, SSN, and proper identification." (Docket Entry # 9, ¶ 19). She "was then asked to sign what were represented to be the usual 'signature cards'" to confirm the accuracy of her information and to provide "a signature sample for the authorized signatory of the checking account." (Docket Entry # 9, ¶ 19). She was told "that she needed to sign the[] signature cards in order to open her account and allow for deposits and withdrawals." (Docket Entry # 9, ¶ 20).

One of the "'signature cards'" plaintiff signed was captioned "Membership Enrollment." The "Membership Enrollment form" gave Century Bank permission to enroll plaintiff into an insurance program issued by Financial Services Association ("FSA"). (Docket Entry # 9, ¶¶ 19, 20). FSA "later became known" as "Affinion Group Holdings, Inc. d/b/a Affinion Group d/b/a Affinion Group Benefits Group d/b/a Affinion Benefits Group LLC."[1] (Docket Entry # 9, ¶ 19).

Affinion's website states that it is "'the global leader in

---

[1] These trade names differ slightly from the aforementioned trade names under which Affinion Group LLC does business. Construing the facts in the amended complaint in plaintiff's favor, FSA later became known as Affinion.

the designing, marketing and servicing of comprehensive customer engagement and loyalty solutions that enhance and extend the relationship of millions of consumers with many of the largest and most respected companies in the world' and [it] does this work for 'virtually every type of business – from financial institutions to retailers.'"   (Docket Entry # 9, ¶ 6). Affinion's clients list is 46 pages long and includes hundreds of financial institutions, including Century Bank.  (Docket Entry # 9, ¶ 7).  An online listing of Affinion's membership programs "includes the 'Benefits Package' at issue in this [a]ction." (Docket Entry # 9, ¶ 7, Ex. C).

The Membership Enrollment form allowed plaintiff to choose either "PLAN 1" or "PLAN 2" by checking a corresponding box. (Docket Entry # 9, Ex. E).  Above her signature in small print appears the following language:

> Member acknowledges receipt of program membership materials and agrees to the terms of the insurance coverage, other services, any applicable monthly membership dues, and any announced changes in fees or services.  PLAN 1 insurance coverage will be in effect if member fails to select plan below.

(Docket Entry # 9, Ex. E).  Plaintiff did not check either box. Immediately below this text and immediately above plaintiff's signature, the Membership Enrollment form directs the signer to "See reverse side for important information before signing." (Docket Entry # 9, Ex. E).  The reverse side, captioned "Membership Agreement," states that:

6

> As the signer of this Membership Enrollment, you and any joint holders of your account are enrolled as members of Financial Services Association (FSA).  Your accidental death insurance coverage becomes effective as soon as this signed enrollment is received by your Financial Institution (FI) . . . Your monthly membership dues, if applicable, will be conveniently deducted from your checking account by either your FI or FSA, and part of it will be used to pay your monthly insurance premium.

(Docket Entry # 9, Ex. E).

   After plaintiff signed the Membership Enrollment form, defendants did not communicate the details of "PLAN 1" to plaintiff.  (Docket Entry # 9, ¶ 21).  Neither Century Bank nor Affinion advised plaintiff that membership dues or any charges would apply to her account.  (Docket Entry # 9, ¶ 21).  Beginning no later than August 2000, however, a $2.00 charge appeared on her monthly bank statement.  (Docket Entry # 9, ¶ 21).  The fee appeared in the "Miscellaneous Debits" section alongside the designation "'benefits package.'"  (Docket Entry # 9, Ex. F). From August 1, 2000 to December 1, 2009, Century Bank deducted the $2.00 fee each month and designated the charge a "benefits package" in each monthly statement.  (Docket Entry # 9, ¶ 21). From January 1, 2010 to April 1, 2012, the bank deducted $3.00 each month identified as a "benefits package" in each monthly statement.  (Docket Entry # 9, ¶ 21).  Beginning on May 1, 2012, the bank applied a $4.00 charge each month depicted as a "benefits package" in each monthly statement.  (Docket Entry # 9, ¶ 21).

7

In short, starting in August 2000, the "benefits package" charge appeared "each month" under the "'Miscellaneous Debits'" section of each bank statement.[2] (Docket Entry # 9, ¶ 21).  The October 2013 monthly statement attached to the amended complaint has a telephone number to call immediately before the "benefits package" designation.  (Docket Entry # 9, ¶ 21).

Plaintiff did not realize she was paying for or receiving any kind of benefits package until she received a Membership Renewal Notice 19 years after she opened the account.  (Docket Entry # 9, ¶ 23).  Specifically, on or about December 2, 2013, plaintiff received a letter from Affinion.  (Docket Entry # 9, ¶ 23).  Captioned "Membership Renewal Notice," the letter informed plaintiff that the benefits package would "be automatically renewed at the $4.00 monthly membership fee" and deducted from her bank account.  (Docket Entry # 9, Ex. D).  The letter provided a telephone number and a website address if plaintiff

_____

[2]  The amended complaint states that:

> at some point in time Century Bank began deducting at least $2, and then $3 and then $4.00 for FSA each month from her checking account that was disguised in the monthly statement under "miscellaneous debits" as a "benefits package" which she understood to be, understandably and foreseeably, the monthly cost for maintaining the checking account.

(Docket Entry # 9, ¶ 21).  Putting aside the legal conclusions ("understandably and foreseeably") and the hyperbole ("disguised"), these facts establish that the monthly statements included the charges "under 'miscellaneous debits' as a 'benefits package'" and that the charges began "at some point in time" but no later than "1 August 2000."   (Docket Entry # 9, ¶ 21).

8

wished to cancel the benefits package.  (Docket Entry # 9, Ex.
D).  "Through her attorney, [plaintiff] repeatedly called the
attached phone number . . . to try to cancel the program but it
always resulted in a busy signal."  (Docket Entry # 9, ¶ 24).
When plaintiff's attorney filed a notice to cancel the package on
the website that Affinion provided, "[plaintiff] never received
any confirmation and the request seems to have disappeared."
(Docket Entry # 9, ¶ 24).

Plaintiff's attorney separately contacted Century Bank in an
effort to stop the monthly membership fees.  Century Bank
initially required a payment of $24.00 to stop the monthly debits
for a six month time period.  (Docket Entry # 9, ¶ 25).
Eventually, Century Bank agreed to stop the monthly debits
without imposing the $24.00 fee but it could "not guarantee that
Affinion" would "not renew the monthly debit."  (Docket Entry #
9, ¶ 25).

In the meantime, Century Bank officials thereafter described
the "'benefits'" to plaintiff's counsel as containing certain
benefits at various times and different benefits at other times.
For example, a Century Bank official described the benefits as,
"Free, Accidental Death Insurance of $10,000 which increases to
$150,000 if traveling via a licensed Common Carrier" but at
another time as "Free, Credit Card Protection" and yet again as
"Free, pharmacy discounts through the Rx Advantage."  (Docket

Entry # 9, ¶ 22).  In further contrast, Affinion's website described the benefits as inter alia a "Hotel Savings Network," "Grocery Coupons," "Group Insurance," "Luggage Protection," "Car Rental Discounts" and "Bonus Travel."  (Docket Entry # 9, ¶ 22).

After plaintiff sent a chapter 93A demand letter, Affinion reimbursed plaintiff $382.00 without interest.  She acknowledges that this amount "is approximately 40% of the 19 years worth of charges" she incurred.  (Docket Entry # 9, ¶ 26.)

Affinion has a number of trade names including, but not limited to, Affinion Benefits Group LLC, Affinion Group and Affinion Group Holdings, Inc.  (Docket Entry # 9, ¶ 6).  It also has a number of subsidiary corporations such as Trilegiant Corporation ("Trilegiant") and Webloyalty Holdings, Inc. ("Webloyalty").  (Docket Entry # 9, ¶ 6).  Affinion and its subsidiaries have been sued a number of times "over [the] practice of enrolling [their] client's customers in a variety of 'rewards programs' through which . . . members pay a small monthly fee . . . in exchange for a variety of services . . .." (Docket Entry # 9, ¶ 9).

For example, under a 2005 settlement with the Attorney General of Florida, Affinion promised to refund $400,000.00 to consumers who were charged membership fees.  (Docket Entry # 9, ¶ 9).  In 2006, Trilegiant, a subsidiary of Affinion, and "Chase Bank USA" reached a $14.5 million settlement with "the Attorneys

General of sixteen states[] to settle charges" that they deceived
"'consumers into paying for membership programs that offered
supposed discounts on things like car and home repair, shopping,
and other goods and services.'" (Docket Entry # 9, ¶ 9).  In
2009, the Senate Committee on Commerce, Science and
Transportation investigated the deceptive practices of
Webloyalty, a subsidiary of Affinion, and subsequently passed the
Restore Online Shoppers Confidence Act, 15 U.S.C. § 8403.
(Docket Entry # 9, ¶ 9).  In 2010, Affinion and its subsidiary
"Trilegiant reached an $8 million settlement agreement with the
Attorney General of New York" and agreed to "provide refunds to
New York Consumers who were enrolled" in Affinion and Trilegiant
programs.  (Docket Entry # 9, ¶ 9).  Later in 2010, Webloyalty,
another subsidiary of Affinion, paid $5.2 million under a
settlement agreement with the Attorney General of New York.  "In
2013, the Attorneys General of some 45 states, including
Massachusetts, and the District of Columbia, reached a $30
million settlement with Affinion, Trilegiant, and Webloyalty."
(Docket Entry # 9, ¶ 9).

All of these settlements involved allegations of misconduct
based on enrollments accomplished through the internet.  (Docket
Entry # 9, ¶¶ 9-12).  In other words, the settlements did not
refer to "non-Internet-based claims against Affinion" such as the
"on-paper practices" used by Century Bank and FSA in the case at

bar.  (Docket Entry # 9, ¶ 12).

DISCUSSION

I.  <u>EFTA Violations</u>

Defendants move to dismiss the EFTA claim in Count I because of the expiration of the one year statute of limitations.  Count I sets out a cause of action under 15 U.S.C. § 1693m ("section 1693m") based on a violation of 15 U.S.C. § 1693e ("section 1693e").  Plaintiff alleges that defendants violated section 1693e by initiating unauthorized electronic fund transfers for the membership program from her bank account "without first obtaining knowing, written authorization from [her]."  (Docket Entry # 9, ¶ 57).

The EFTA "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems."  15 U.S.C. § 1693(b).  "The primary objective" or goal of the EFTA "is the provision of individual consumer rights."  15 U.S.C. § 1693(b).

Section 1693e mandates that any "preauthorized electronic fund transfer" must be "authorized by the consumer only in writing."[3]  15 U.S.C. § 1693(e); <u>see</u> 12 C.F.R. § 205.10.  The statute defines a "preauthorized electronic fund transfer" as "an

---

[3]  The statute additionally requires the financial institution to provide the consumer with a copy of the authorization.  15 U.S.C. § 1696e.  Any allegation or cause of action based upon not receiving a copy of the authorization is untimely because it took place in 1995 when plaintiff opened the bank account.

12

electronic fund transfer authorized in advance to recur at substantially regular intervals."  15 U.S.C. § 1693a(9).  An electronic fund transfer is "unauthorized" if it is a "transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit."  15 U.S.C. § 1693a(11).  In addition, when a preauthorized electronic fund transfer will vary in amount from the previous transfer, the financial institution must "send the consumer written notice of the amount and date of the transfer at least 10 days before the scheduled date of transfer."[4]  12 C.F.R. § 205.10; see 15 U.S.C. § 1693e(b).  Section 1693m provides a cause of action against "any person who fails to comply with [section 1693e] with respect to any consumer."  15 U.S.C. § 1693m(a).

The EFTA has a one year statute of limitations.  15 U.S. § 1693m(g).  It states that an ETFA claim "may be brought in any United States district court, or in any other court of competent jurisdiction, within one year *from the date of the occurrence of the violation*."  15 U.S. § 1693m(g) (emphasis added).  The timeliness of the EFTA claim therefore depends on when the "occurrence of the [section 1693e] violation[s]" took place.  17 U.S.C. § 1693m(g).  To state the obvious, the accrual date of a

---

[4]  Here, the last variation was the $4.00 fee imposed on or before May 2012.  (Docket Entry # 9, ¶ 21).  This variation took place more than one year before plaintiff filed the original complaint.

cause of action based on a federal law that includes a statute of limitations is a matter of federal law.  See generally Guilbert v. Gardner, 480 F.3d 140, 149 (2nd Cir. 2007).

Plaintiff argues that each electronic transfer was "either a discrete cause of action or a continuing violation that starts the running of the one-year statute of limitations anew at each violation." (Docket Entry # 14, pp. 9-10).  According to plaintiff, each monthly transfer began a new limitations period because it was a discrete act and, accordingly, she should "at a minimum" recover for the unauthorized charges that "'occurred'" on or after February 7, 2013.  (Docket Entry # 14, p. 9).  If the discrete acts do not create an actionable violation, plaintiff maintains that the continuing violation doctrine applies.

Plaintiff distinguishes defendants' cases because they rely on statutes of limitations that use words such as "discovery," "accrues" and "injury" that are absent from the EFTA.[5]  Plaintiff asserts it is more appropriate to rely on cases interpreting the statute of limitations in the Civil Rights Act of 1964 ("Title VII"), 42 U.S. § 2000e-5(e) ("charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred"), and the Truth in Lending Act ("TILA"), 15 U.S. § 1640(e) ("within one year from the date of the occurrence of the violation").  Like the EFTA, both

---

[5]  As explained infra, case law interpreting the limitations period for section 1693e unauthorized transfers is sparse.

statutes, as plaintiff points out, either use the term "occurrence" or "occurred."

Statutory interpretation "always starts with the language of the statute itself." <u>Matamoros v. Starbucks Corp.</u>, 699 F.3d 129, 134 (1st Cir. 2012).  Interpreting the particular words in section 1693e is further guided by the statutory framework and the purpose of the statute.  <u>See</u> <u>Dolan v. U.S. Postal Service</u>, 546 U.S. 481, 486 (2006) ("[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute" and "precedents or authorities that inform the analysis"); <u>Lawson v. FMR LLC</u>, 670 F.3d 61, 68 (1st Cir. 2012) (circuit "and Supreme Court precedent require" examination of "broader statutory framework, including particularly the nearby language and the title and caption").

The language of section 1693m dictates that the time to bring the cause of action is "within one year from the date of the *occurrence* of the *violation*."  15 U.S.C. § 1693m(g) (emphasis added).  Ordinarily, "Federal law incorporates 'the standard rule that'" a statute of limitations begins to run "'when the plaintiff has "a complete and present cause of action."'" <u>Greenwood ex rel. Estate of Greenwood v. New Hampshire Public Utilities Com'n</u>, 527 F.3d 8, 14 (1st Cir. 2008) (quoting <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007), quoting <u>Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. Of Ca., Inc.</u>, 522

U.S. 192, 201 (1997)).  As also explained in <u>Greenwood</u>, "'A limitations period begins to run when the plaintiff "knows or has reason to know of the injury which is the basis for his claim."'" <u>Id.</u> (quoting <u>Rodríguez–García v. Municipality of Caguas</u>, 354 F.3d 91, 96–97 (1st Cir. 2004), quoting <u>Rodriguez Narvaez v. Nazario</u>, 895 F.2d 38, 41 n.5 (1st Cir. 1990)); <u>Randall v. Laconia, NH</u>, 679 F.3d 1, 6 (1st Cir. 2012) ("causes of action typically accrue when the aggrieved party suffers his injury").

The plain language of section 1693m supports the application of this standard rule to the statute.  Section 1693m gauges the start of the one year time period as when a "violation" occurs and a "violation," as commonly understood under federal common law, takes place when a plaintiff has "'a complete and present cause of action.'"  <u>Wallace v. Kato</u>, 549 U.S. at 388; <u>Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.</u>, 522 U.S. at 201.

In fact and in addition to other reasons, the Sixth Circuit relied on this "'standard rule'" in determining the accrual date of the one year limitations period to a section 1693e cause of action.  <u>Wike v. Vertrue, Inc.</u>, 566 F.3d 590, 593 (6th Cir. 2009) ("[a]s a 'standard rule,' the statute of limitations begins to run 'when the plaintiff has a complete and present cause of action' and thus 'can file suit and obtain relief'").  Applying the rule to the section 1693e cause of action, the Sixth Circuit

in <u>Wike</u> stated that, "A consumer is injured only if, and only when, funds are withdrawn from her account."[6]  <u>Id.</u>  The court therefore held that the statute of limitations period began to run "when the first recurring transfer took place."  <u>Id.</u>

Under the plain language of section 1693e, a "violation" of section 1693e requires a "*transfer*" that is not preauthorized, which is the violation alleged by plaintiff.[7]  Likewise, a consumer is not *injured* until the transfer takes place and the funds are withdrawn from the consumer's account.  <u>Wike v. Vertrue, Inc.</u>, 566 F.3d at 593.  Each recurring transfer causes a new injury in the form of the additional debit to the account.  Accordingly, even though the preauthorization, if any, took place when plaintiff signed the Membership Enrollment in July 1995 (Docket Entry # 9, Ex. E), plaintiff did not have a complete and present cause of action until the time an unauthorized transfer occurred.  <u>See</u> <u>id.</u>; <u>see</u> <u>generally</u> <u>Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Ca., Inc.</u>, 522 U.S. at 195 (Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461, claim "does not ripen" until "employer fails to make a payment on the schedule set by the fund" and limitations period does not begin to run" until "scheduled

---

[6]  The Sixth Circuit is the only circuit to address the statute of limitations in the context of a section 1693e claim for unauthorized transfers.

[7]  Other means to violate section 1693e include a transfer that varies in amount without prior notice or fails to comply with a "stop payment" instruction.  15 U.S.C § 1693e.

payment is missed").

The Sixth Circuit in <u>Wike</u> did not address whether an untimely transfer taking place more than one year before Wike filed suit was actionable.  Rather, the first recurring transfer in <u>Wike</u> took place within one year of the date that Wike filed suit.  <u>Wike v. Vertrue, Inc.</u>, 566 F.3d at 592.  Hence, there was no occasion to address the issue here, namely, whether a timely transfer can capture the untimely transfers under the continuing violation doctrine espoused by plaintiff or whether the transfers are discrete acts that re-start the limitations period at the time of each transfer.[8]

Two district courts cases, one in California and the other in Illinois, cited by defendants conclude that the first recurring transfer not only triggers the one year limitations period as to that transfer but also triggers the period for all subsequent transfers that take place in the future.  <u>See</u> <u>Pelletier v. Pacific WebWorks, Inc.</u>, 2012 WL 43281, at *7 (E.D.Cal. Jan. 9, 2012); <u>Repay v. Bank of Am., N.A.</u>, 2013 WL 6224641, at *4 (N.D.Ill. Nov. 27, 2013).[9]  The court in <u>Repay</u> reasoned that section 1693e requires *written* authorization at the

---

[8]  The issue in <u>Wike</u> was whether the one year limitations period began before the first transfer when the payee took all of the necessary steps to arrange the first transfer.  <u>See</u> <u>id.</u>
[9]  Defendants cite both cases to argue that the section 1693e claim accrued no later than the first unauthorized transfer in August 2000.  The <u>Pelletier</u> decision provides little discussion or guidance regarding the continuing violation doctrine as distinguished from discrete violations.

beginning of a series of electronic transfers and not for every recurring transfer.  <u>Repay v. Bank of Am., N.A.</u>, 2013 WL 6224641, at *4.  Consequently, because a separate written authorization was not required for each recurring transfer and the plaintiff initially agreed orally to the transfers, the court rejected the plaintiff's argument that each transfer was a discrete act that violated section 1693e.  <u>Id.</u>  The relevant portion of the decision reads as follows:

> As in <u>Wike</u>, Plaintiff had all the notice necessary to assert his claim for lack of written authorization on the date of the first of these regularly recurring transfers.
>
> Plaintiff contends that he has alleged a series of discrete acts that violated [the] EFTA.  But the EFTA does not require that the payee obtain a separate written authorization for each transfer.  Instead, the payee must obtain a single written authorization for the entire series of transfers.  Thus, once the series of transfers is initiated by the first transfer, the violation occurs and Plaintiff is harmed.  Put another way, rather than alleging a series of wrongful acts, Plaintiff has alleged a wrongful omission:  failing to obtain written authorization for the series of transfers that were agreed upon and to provide a copy to the consumer.  <u>See Clark v. City of Braidwood</u>, 318 F.3d 764, 766 (7th Cir. 2003) ("[T]he continuing violation doctrine does not save an otherwise untimely suit when a single event gives rise to continuing injuries.").

<u>Id.</u>

The <u>Repay</u> decision, however, is not binding on this court and overstates the reach of the <u>Wike</u> decision.[10]  It is also

---

[10]  Plaintiff erroneously contends that the <u>Pelletier</u> and <u>Repay</u> cases are unpublished decisions.  Unpublished decisions are those "designated by a federal court as 'unpublished,' 'not for publication,' 'non-precedential,' 'not precedent,' or the like." Advisory Committee Notes to Fed.R.App.P. 32.1.  A case reported in a publically accessible electronic database such as WestLaw does not always carry a designation that it is an unpublished

distinguishable because in the case at bar Century Bank

purportedly never obtained not only a valid written authorization

but also never obtained a verbal authorization.  See id. ("[i]f

Plaintiff had alleged that Defendants initiated an electronic

transfer that he did not agree to, then he presumably would have

one year from the date of that transfer to bring his EFTA claim")

(emphasis added).  Moreover, applying the continuing violation,

which is an equitable doctrine, to an EFTA claim serves the broad

goal of the statute to enhance the "individual consumers rights."

15 U.S.C. § 1693(b); see Havens Realty Corp. v. Coleman, 455 U.S.

363, 380-381 (1982) (plaintiffs' "wooden application of § 812(a),

which ignores the continuing nature of the alleged violation,

only undermines the broad remedial intent of Congress embodied in

the Act").  The result in Repay also denies relief to a consumer

for future unauthorized transfers even though the consumer has

not suffered an injury in the form of that future transfer.

Thus, if the plaintiff missed the one year limitations with

respect to the first transfer, the financial institution could

continue to debit the funds after the one year time period and

the plaintiff would have no recourse.  It therefore contravenes

the above noted principle that a cause of action "typically

---

decision.  See Kline v. Zimmer Holdings, Inc., 2013 WL 3279797,
at *6 (W.D.Pa. June 27, 2013) ("district court cases . . . are
not rendered more or less persuasive based on whether they appear
in a bound West reporter or an electronic database (which is what
Defendants call 'unpublished')").  Neither Pelletier nor Repay
include a designation that it is an unpublished decision.

accrue[s] when the aggrieved party suffers his injury." Randall
v. Laconia, NH, 679 F.3d at 6.

The Havens Court framed the continuing violation doctrine as
applicable when a plaintiff "challenges not just one incident of
conduct violative of the Act, but an unlawful practice that
continues into the limitations period." Havens Realty Corp. v.
Coleman, 455 U.S. at 380-381.  As explained in Havens, a
complaint is timely filed if "the last asserted occurrence of
that practice" falls within the limitations period.  Havens
Realty Corp. v. Coleman, 455 U.S. at 380-381 (Fair Housing Act
claim).  The continuing violation doctrine is also commonly
applied to Title VII claims particularly those raising a hostile
work environment or racial harassment.  See Tobin v. Liberty
Mutual Insurance Co., 553 F.3d 121, 130 (1st Cir. 2009); see
generally Randall v. Laconia, NH, 679 F.3d at 6 (examining
parameters of accrual under other federal statutes because First
Circuit had not decided accrual particulars under 42 U.S.C. §
4852d cause of action).

Assuming for purposes of argument only that the continuing
violation doctrine applies to an EFTA claim, it is well settled
that the doctrine "does not apply to 'discrete acts' of alleged
discrimination that occur on a 'particular day' . . .." Tobin v.
Liberty Mutual Insurance Co., 553 F.3d 121, 130 (1st Cir. 2009);
see also National Railroad Passenger Corp. v. Morgan, 536 U.S.

101, 113 (2002) (noting that "discrete discriminatory acts are
not actionable if time barred, even when they are related to acts
alleged in timely filed charges"); see, e.g., Bazemore v. Friday,
478 U.S. 385, 395 (1986) (not applying continuing violation
doctrine to discriminatory salary structure because "[e]ach
week's paycheck that deliver[ed] less to a black than to a
similarly situated white is a wrong actionable under Title VII");
Simard v. LVNV Funding, LLC, 2011 WL 4543956, at *3 (D.Mass.
Sept. 28, 2011) (quoting Jones v. Investment Retrievers, LLC,
2011 WL 1565851, at *3 (M.D.Pa. April 25, 2011)); Jones v.
Investment Retrievers, LLC, 2011 WL 1565851, at *3 ("[c]onduct
which independently violates the FDCPA is actionable if it falls
within the limitations period, even if undertaken in pursuit of
litigation that was filed outside the limitations period").[11]
Tobin is particularly instructive because it explains at length
the difference between separate and independently actionable
discrete acts and related and recurring acts that fall under the
continuing violation doctrine.  As articulated in Tobin, the
doctrine applies to hostile work environment claims because
"'their very nature involve repeated conduct'" and "'a single act
of harassment may not be actionable on its own.'"  Tobin v.
Liberty Mutual Insurance Co., 553 F.3d at 130 (quoting National

---

[11]  FDCPA is an acronym for the Federal Debt Collections Practices
Act, 15 U.S.C. §§ 1692 et seq., which has a statute of
limitations similar to the EFTA.  See 15 U.S.C. § 1692k.

Railroad Passenger Corp. v. Morgan, 536 U.S. at 115) (internal brackets omitted).

Consequently, the existence of past untimely and related acts does not prevent a Title VII employee "'from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.'" Tobin v. Liberty Mutual Insurance Co., 553 F.3d at 131 (quoting National Railroad Passenger Corp. v. Morgan, 536 U.S. at 113). Indeed, "'A freestanding violation may always be charged within its own charging period regardless of its connection to other violations.'" Id. (quoting Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 636 (2007), in parenthetical). As similarly articulated recently by the Supreme Court, "Separately accruing harm should not be confused with harm from past violations that are continuing." Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S.Ct. 1962, 1969 (2014). Separately accruing harm occurs when each new act, such as each new transfer from plaintiff's bank account, "cause[s] 'harm [to the plaintiff] over and above the harm that the earlier acts caused.'" Id. (quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997), in parenthetical and comparing Klehr to Havens Realty Corp. v. Coleman, 455 U.S. at 380-381).

In the case at bar, the repeated transfers from plaintiff's bank account are independently actionable even though they all

relate to plaintiff's July 1995 enrollment in the membership

benefits package and the allegedly unknowing and invalid

authorization of the charges.  Each transfer constitutes a new

harm above and beyond the prior harm of a prior transfer and it

amounts to an independent violation of section 1693e.  The

transfers do not simply continue the initial effects of the first

transfer and section 1693e violation that occurred no later than

August 2000.  Rather, each transfer is an independent violation

of section 1693e because it is a new transfer that causes new

harm to plaintiff in an amount, albeit only $4.00, "over and

above" the prior transfers.  Thus, even though the new transfer

stems from the initial unknowing authorization in July 1995, it

constitutes a new and independent violation because the new

transfer is a required element of a section 1693e violation to

recover for that transfer.  Without a transfer, there is no

section 1693e violation.  The new transfer is also a new harm

"over and above the harm" caused by the earlier transfers.

Plaintiff may therefore bring a section 1693e claim for the

discrete acts of the purportedly unauthorized transfers that took

place within one year of the time plaintiff filed the complaint.

Transfers prior thereto, however, are barred by the one year

statute of limitations to the extent plaintiff relies on

application of the continuing violation doctrine as a means to

render them timely.  As indicated above, discrete acts cannot

serve as a basis to apply the continuing violation doctrine and thereby recapture and recover damages for the untimely acts.  See Gorelik v. Costin, 605 F.3d 118, 122 (1st Cir. 2010) ("discrete discriminatory acts which occur outside the limitations period are time-barred and no longer actionable") (citing National Railroad Passenger Corporation v. Morgan, 536 U.S. at 115).

II.  State Law Claims

A.  Untimeliness

   Defendants submit that the state law claims are untimely. Plaintiff argues that each of the counts relies on discrete acts and sets out different causes of action.  She submits that, irrespective of the discovery rule or fraudulent concealment, the claims are not barred for violations that took place within the applicable limitations period immediately prior to the time she filed suit.

   Identifying the limitations periods, a three year tort limitations period applies to conversion claims similar to the one in the case at bar.  See International Strategies Group, Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 14 (1st Cir. 2007) (conversion claim based on unauthorized transfer of funds to another account sounds in tort).  Fraud claims in Massachusetts are likewise subject to the three year limitations period in section 2A of Massachusetts General Laws chapter 260 ("chapter 260").  See Pilalas v. Cadle Co., 695 F.3d 12, 14 (1st Cir. 2012)

25

("limitations period under [Massachusetts] state law is three years for fraud"); <u>Salois v. Dime Savings Bank of New York, FSB</u>, 128 F.3d 20, 24 (1st Cir. 1997); <u>Stolzoff v. Waste Systems International, Inc.</u>, 792 N.E.2d 1031, 1038 (Mass.App.Ct. 2003) ("common-law torts of fraud and misrepresentation are subject to a three-year statute of limitations"). A four year statute of limitations applies to chapter 93A claims. <u>See</u> Mass. Gen. Laws ch. 260, § 5A; <u>Latson v. Plaza Home Mortg., Inc.</u>, 708 F.3d 324, 326-327 (1st Cir. 2013) ("limitations period for chapter 93A actions is four years from injury").

Whether the three year tort limitations period in section 2A of chapter 260 or the six year contract limitations period in section two applies to the unjust enrichment claim depends upon "the 'gist of the action.'" <u>Massachusetts Housing Opportunities Corp. v. Whitman & Bingham Associates, P.C.</u>, 983 N.E.2d 734, 738 (Mass.App.Ct. 2013) (quoting <u>Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.</u>, 489 N.E.2d 172, 175 (Mass. 1986)); <u>Hendrickson v. Sears</u>, 310 N.E.2d 131, 132 (Mass. 1974); <u>Epstein v. C.R. Bard, Inc.</u>, 2004 WL 1598912, at *3 (D.Mass. July 19, 2004) ("[t]he statute of limitations applicable to unjust enrichment depends upon the 'essential nature of plaintiff's claim'"). Count IV alleges that defendants received payments from plaintiff by debiting her bank account for fees that she did not authorize when she signed the Membership Enrollment

"signature card."  The gist of the claim is therefore contractual and a six year limitations period applies.  See, e.g., In re Duplication Management, Inc., 501 B.R. 462, 488 (Bkrtcy.D.Mass. 2013); Hernandez v. Harvard University, 2013 WL 1330842, at *3 (D.Mass. March 28, 2013) (unjust enrichment claim based on withholding gratuities was subject to six year statute of limitations).  Similarly, the claim for money had and received is "one of quasi-contract," Brine v. Paine, Webber, Jackson & Curtis, Inc., 745 F.2d 100, 102 (1st Cir. 1984), and the six year contract limitations period therefore applies.  See Mass. Gen. Laws ch. 260, § 2.

In Massachusetts, a cause of action for a common law *tort* claim accrues when a plaintiff is injured.  Pagliuca v. City of Boston, 626 N.E.2d 625, 628 (Mass.App.Ct. 1994); Joseph A. Fortin Const., Inc. v. Massachusetts Housing Finance Agency, 466 N.E.2d 514, 516 (Mass.App.Ct. 1984).  This same general principle adheres to the chapter 93A claim.  See Cambridge Plating Company, Inc. v. NAPCO, Inc., 991 F.2d 21, 25 (1st Cir. 1993) ("accrual of a chapter 93A claim typically occurs at the time injury results from the assertedly unfair or deceptive acts").

Focusing on the injuries and the elements of each of the state law tort claims, a conversion claim requires proof that the defendant "'intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which

27

defendant has no right of possession at the time.'"   Grand
Pacific Finance Corp. v. Brauer, 783 N.E.2d 849, 857
(Mass.App.Ct. 2003) (internal brackets omitted); accord In re
Brauer, 890 N.E.2d 847, 857 (Mass. 2008) ("'elements of
conversion require that a defendant be proved to have
"intentionally or wrongfully exercised acts of ownership, control
or dominion over personal property to which he has no right of
possession at the time"'").  Plaintiff alleges that defendants
converted money by false pretenses and that the debits that took
place within three years before she filed suit are timely.
According to plaintiff, defendants wrongfully exercised control
over her funds each time they debited her account for membership
fees.

Finding no Massachusetts case that addresses the issue,
cases elsewhere uniformly support plaintiff's position.  See
Therrell v. Georgia Marble Holdings Corp., 960 F.2d 1555, 1560
(11th Cir. 1992) (noting, in case involving mineral conversions
dating back more than four years before suit, that "general
statute of limitations rule bars plaintiffs from recovery for all
conversion that occurred more than four years before the filing
of the complaint"); W.W. McDonald Land Co. v. EQT Production Co.,
983 F.Supp.2d 790, 811 (S.D.W.Va. 2013) ("requisite elements of
the plaintiffs' causes of action," including conversion, "accrued
at the time of each allegedly deficient royalty payment"); In re

Estate of Whipple, 2013 WL 1641414, at *6 (Tex.App.Ct. April 17, 2013) (conversion of rental income on monthly basis dating back to 1997 was timely only for "unlawful takings from February 19, 2006 to July 4, 2006"); Slate v. Byrd, 2013 WL 1103275, at *29 (M.D.N.C. March 15, 2013) (in cases "'of multiple conversions, the date of the latest conversion is applicable in determining a claim that the complaint is barred by the three-year Statute of Limitations'" and dismissing any conversion occurring more than three years before suit was filed); Rudich v. Metro Goldwyn Mayer Studio, Inc., 2008 WL 4693409, at *3 (W.D.Wis. Aug. 27, 2008). Accordingly, the debits taking place within three years before plaintiff filed suit are timely.

The aiding and abetting count asserts that Century Bank aided and abetted Affinion's breaches of "legal duties to" plaintiff.  (Docket Entry # 9, ¶ 97).  Similar to the conversion claim, the claim alleges that the bank aided and abetted the unauthorized transfers from plaintiff's bank account with the injury thereby constituting the transferred amount.  To the extent the count is based on conversion, the gist of the cause of action sounds in tort.  See International Strategies Group, Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 14 (1st Cir. 2007) ("ISG bases [aiding and abetting] claims on COB's unauthorized transfer of $821,500 of ISG's investment to an ESCM account" and, as such, "[b]oth claims against ESCM sound in tort") (citing Massachusetts

law).  Given the timeliness of the conversions dating back three
years before plaintiff filed suit, the similar aiding and
abetting allegations likewise survive dismissal.

The fraud claim depends upon different elements than the
conversion claim even though the damages concern the recurring
transfers.  The fraud claim requires plaintiff to establish that
"the defendant 'made a false representation of material fact with
knowledge of its falsity for the purpose of inducing the
plaintiff to act thereon, and that the plaintiff reasonably
relied upon the representation as true and acted upon it to his
damage.'"[12]  <u>Taylor v. Am. Chemistry Council</u>, 576 F.3d 16, 31 (1st
Cir. 2009) (quoting <u>Russell v. Cooley Dickinson Hosp., Inc.</u>, 772
N.E.2d 1054, 1066 (Mass. 2002)).  "Proof of damages flowing from
the misrepresentations is essential to recovery."  <u>Ravosa v.
Zais</u>, 661 N.E.2d 111, 117 n.12 (Mass.App.Ct. 1996).

Plaintiff alleges that when she opened her checking account
in 1995, she was asked to sign "'signature cards'" and that,
"unbeknownst to her, one of these 'signature cards'" was the
enrollment form that automatically enrolled her in FSA's
insurance plan.  (Docket Entry # 9, ¶ 19).  Five years later,

---

[12]  Defendants point out that plaintiff did not individually
address the timeliness of the fraud claim.  She nevertheless
argued that all of the common law counts are based on discrete
acts with distinct causes of action thereby "allowing recovery of
damages within the limitations period regardless of any discovery
rule or fraudulent concealment . . .."  (Docket Entry # 14).  The
argument therefore encompasses the fraud claim.

debits began appearing on her bank statement for a "'benefits package.'" (Docket Entry # 9, ¶ 21). As to the fraud claim, the required element of damages flowing from the misrepresentation is the transfers from plaintiff's bank account. (Docket Entry # 9, ¶ 73) (defendants' omissions of material facts "enable[d] Defendants to defraud the Class," including plaintiff, "of up to or more than $4 per month").

The injuries therefore began to occur in August 2000. With all of the elements for the cause of action in place, the fraud claim therefore accrued no later than August 2000. As reasoned by the First Circuit in <u>Salois</u>:

> [P]laintiffs' claims arose when Dime allegedly induced them to sign loan contracts by misrepresenting and/or omitting facts about the terms of the mortgage, charged them excessive closing fees, and serviced their loans improperly by giving inadequate answers to telephone inquiries about negative amortization and by having the Saloises sign corrective documents that improperly altered their loan.

<u>Salois v. Dime Savings Bank of New York, FSB</u>, 128 F.3d at 25.

In opposing defendants' motion, plaintiff does not rely on the discovery rule, fraudulent concealment or equitable tolling. (Docket Entry # 14). After discussing the conversion claim, plaintiff unequivocally states that, "Regardless of a lack of any tolling of the statute of limitations by the discovery rule or by fraudulent concealment and even if there is no continuing violation, the next question is 'whether the plaintiffs' damages are limited to those arising from Defendants' torts accruing

31

within the three-year period immediately prior to the filing of the complaint.'"  (Docket Entry # 14) (quoting Crocker v. Townsend Oil Co., Inc., 979 N.E.2d 1077, 1084 (Mass. 2012)). Plaintiff's reliance on Crocker to salvage the fraud claim is misguided.

Crocker involved a Wage Act claim brought by employees based on their employers' improper classification of them as independent contractors.  Id. at 1079.  As explained by the Massachusetts Supreme Judicial Court ("SJC") in Crocker:

> "The plaintiff who suffers damage down to the date of the commencement of the action may recover for all damage incurred within the applicable period of the statute of limitations, but if the [tort] has perdured for a period longer than the allowable period for bringing an action, the plaintiff is barred from recovering damages for the time antedating the allowable period, though his action is not barred.  *The continuing nature of the wrong keeps alive the right to bring the action, but damages are recoverable only for that period within which the statute otherwise permits the commencement of an action.*"

Id. (quoting J.R. Nolan & B. Henry, Civil Practice § 15.6, at 358 (3rd ed. 2004)) (emphasis and brackets in original).  Prior to Crocker, Massachusetts cases limited this principle to nuisance and trespass cases.  See generally Taygeta Corp. v. Varian Associates, Inc., 763 N.E.2d 1053, 1064 (Mass. 2002).

The application in Massachusetts of the analogous continuing violation exception applies to cases where the challenged behavior, taken as a whole, constitutes a pattern of mistreatment.  See Diaz v. Jiten Hotel Management, Inc., 671 F.3d

78, 85 (1st Cir. 2012) ("[u]nder Massachusetts law, where a
plaintiff alleges a pattern of discriminatory conduct, . . . the
continuing violation doctrine applies"); Cuddyer v. Stop & Shop
Supermarket Co., 750 N.E.2d 928, 937-939 (Mass. 2001).  It
requires the plaintiff to establish that "at least one
discriminatory act occurred within" the limitations period to
anchor the earlier untimely discriminatory acts.  Ocean Spray
Cranberries, Inc. v. Massachusetts Com'n Against Discrimination,
808 N.E.2d 257, 266 (Mass. 2004); Cuddyer v. Stop & Shop
Supermarket Co., 750 N.E.2d at 936-937; Mack v. Great Atlantic
and Pacific Tea Company, Inc., 871 F.2d 179, 183 (1st Cir. 1989)
(the plaintiff bears the burden of showing that at least one
discriminatory act occurred within the limitations period).  As
recognized by the SJC in Crocker, the continuing violation
doctrine does not apply to discrete acts.  See Crocker v.
Townsend Oil Co., Inc., 979 N.E.2d at 1084-1085 (discussing
Silvestris v. Tantasqua Regional School District, 847 N.E.2d 328,
338-339 (Mass. 2006)).

Here, however, there is no timely, discrete act of fraud.
In other words, there is no independent fraud claim that occurred
during the three years prior to the time plaintiff filed suit.
Rather, the fraud claim accrued when plaintiff was injured in
August 2000 and the recurring transfers constitute additional
damages as opposed to discrete and timely actionable

misrepresentations of material fact.[13]

Turning to the timeliness of the chapter 93A claim, plaintiff submits that the "claim is based on the violations of the EFTA" and the regulations promulgated under the statute. (Docket Entry # 14) (Docket Entry # 9, ¶ 99).  In determining whether an "act or practice violates the unfairness prong of Chapter 93A, Massachusetts courts assess: '(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers.'" Cooper v. Charter Communications Entertainments I, LLC, 760 F.3d 103, 111 (1st Cir. 2014) (quoting Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005)).  A failure "to pay a credit in accord with [a] statutorily-imposed contractual obligation would likely violate Chapter 93A." Id. (citing Casavant v. Norwegian Cruise Line Ltd., 952 N.E.2d 908, 912-913 (Mass. 2011)).  "Causation of damages is required for a chapter 93A claim." Liu v. Amerco, 677 F.3d 489, 496 (1st Cir. 2012).  Here, those damages or injuries consist of the repeated, recurring unauthorized transfers from plaintiff's bank account.

In light of the timeliness of the transfers that took place

---

[13]  It is therefore not necessary to address defendants' alternative arguments to dismiss the fraud claim.

34

within one year of the time plaintiff filed suit with respect to
the EFTA claim and the fact that plaintiff grounds the chapter
93A claim on the EFTA, dismissal of the chapter 93A claim under
Rule 12(b)(6) as untimely is not warranted.   In short, the facts
in the amended complaint set out a plausible basis that the
chapter 93A claim based on the EFTA violations is timely.
Because the claim survives dismissal, it is not necessary to
decide at this point whether the transfers date back only one as
opposed to four years.  See generally Crooker v. Wachovia Bank,
N.A., 2008 WL 2066943, at *1 n.4 (D.Mass. May 14, 2008).
Finally, defendants' reliance on a Connecticut case, In re
Trilegiant Corp., Inc., 11 F.Supp.3d 82, 104, 121 (D.Conn. 2014),
applying federal law to the accrual of the four year limitations
period applicable to civil RICO claims and Connecticut law to an
unfair trade practices claim under admittedly similar facts does
not convince this court otherwise.

Turning to the contract based claims for unjust enrichment
and money had and received, plaintiff submits the claims are
timely because they are obligations payable in installments.
(Docket Entry # 14).  Defendants maintain that the Membership
Enrollment agreement is not an installment contract.  (Docket
Entry # 20).

"The general rule in breach of contract cases is that a
cause of action accrues when the contract is breached."  Flannery

35

v. Flannery, 705 N.E.2d 1140, 1143 (Mass. 1999). When "an
obligation is payable in installments, the general rule is that
the applicable statute of limitations begins to run against the
recovery of each installment from the time it becomes due" and
each payment amounts to a separate breach. Id. (citing McDade v.
Moynihan, 115 N.E.2d 372, 374 (Mass. 1953), for principle that
each breach gives rise to separate action). As explained in a
First Circuit case relied upon by plaintiff:

> "When the statute of limitations for a breach of contract
> begins to run depends on whether the contract is entire or
> divisible." Flannery v. Flannery, 429 Mass. 55, 705 N.E.2d
> 1140, 1143 (1999). If an obligation is payable in
> installments, the statute of limitations begins to run
> against the recovery of each installment from the time it
> becomes due. See id.; Clark v. Trumble, 44 Mass.App.Ct.
> 438, 692 N.E.2d 74, 79-80 (1998). This rule applies even
> where one contract provides all the terms of the agreement
> between the parties, so long as the contract requires that
> the payments be made in installments. See Flannery, 705
> N.E.2d at 1143. A contract need not specifically reference
> installments to be deemed an installment contract. See,
> e.g., Allan R. Hackel Org., Inc. v. American Radio Sys.
> Corp., No. 980335, 2000 WL 281689, at * 2 (Mass.Super. Jan.
> 12, 2000) ("The parties' actual performance, which has been
> over time, is a reliable indication that this [is] an
> installment contract.").

Berezin v. Regency Sav. Bank, 234 F.3d 68, 73 (1st Cir. 2000). "A
divisible contract contemplates performance divided into
differing parts, with separate consideration provided for each."
Flannery v. Flannery, 705 N.E.2d at 1143. Massachusetts courts
characterize promissory notes with monthly payments of principal
and interest as well as an injured employee's weekly cash
benefits as installment contracts. See id. Massachusetts law

36

also treats a lease as well as an alimony agreement to pay weekly amounts until remarriage or death as installment contracts.  See Flannery v. Flannery, 705 N.E.2d 1140, 1143 (Mass. 1999) (alimony agreement); Moda v. Terminex International Co., 1999 WL 1038030, at *2 (Mass.App.Div. Nov. 10, 1999) (lease).

In the present case, even though one contract provided all the terms between the parties, the facts support the existence of an installment contract.  Accordingly, the amended complaint sets out a plausible basis that plaintiff may recover damages for the unjust enrichment and money had and received claims for the six year period preceding the February 2014 filing of the complaint.[14] Defendants' statute of limitations argument does not warrant the dismissal of counts IV and V.

As a final matter, defendants argue that plaintiff does not plausibly allege that they are estopped from raising the statute of limitations defense.  Separately, defendants maintain that neither fraudulent concealment nor the discovery rule toll the statute of limitations.  The amended complaint does not identify any affirmative defenses.  As previously noted, in opposing defendants' motion, plaintiff does not argue that defendants are estopped from raising the statute of limitations or that fraudulent concealment provides a basis to avoid the statute of

---

[14]   Whether plaintiff satisfies the foregoing parameters for the contract claims on summary judgment or at trial is not before this court.

limitations.  She also does not rely on the discovery rule.
Rather, plaintiff argues that "even assuming that a reasonable
person would have caught the Defendants' unauthorized" transfers
at an earlier point in time, the common law tort and contract
claims are timely for all unauthorized transactions or violations
that took place within the applicable limitations period
immediately prior to the time she filed suit.  (Docket Entry #
14).  Because plaintiff does not raise estoppel, fraudulent
concealment or the discovery rule to salvage the timeliness of
the claims, it is not necessary to address defendants' arguments
that the doctrines do not apply.  In other words, because
estoppel, fraudulent concealment and the discovery rule only
serve to delay, toll or bar the running of the limitations
periods, they do not provide a basis to dismiss the claims as
untimely.

B.  Unjust Enrichment and Money Had and Received Claims

    Defendants move to dismiss the unjust enrichment and money
had and received claims because plaintiff has an adequate remedy
at law.  Citing and quoting a district court decision, Cooper v.
Charter Comms, Inc., 945 F.Supp.2d 233, 244 (D.Mass. 2013)
(dismissing unjust enrichment and money had and received claims
because existing breach of contract claim precluded recovery for
these equitable causes of action), defendants contend that the
multiple statutory and common law claims preclude recovery under
the equitable doctrines of unjust enrichment and money had and

received.  Plaintiff argues that when a contract is unenforceable because of fraud, a party may recover for unjust enrichment and for money had and received.

Unjust enrichment and money had and received are each equitable causes of action available to a plaintiff who lacks an adequate remedy at law.  See Reed v. Zipcar, Inc., 883 F.Supp.2d 329, 334 (D.Mass. 2012) (existence of statutory chapter 93A claim precluded plaintiff "from bringing equitable claims for unjust enrichment and money had and received, remedies available only when a party lacks an adequate remedy at law"); Fernandes v. Havkin, 731 F.Supp.2d 103, 114 (D.Mass. 2010) ("[p]laintiff's negligence and chapter 93A claims thus preclude a claim for unjust enrichment"); Santagate v. Tower, 833 N.E.2d 171, 176 (Mass.App.Ct. 2005) ("equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law"); see also Foster v. Evans, 429 N.E.2d 995, 999 (Mass. 1981) (because "plaintiff here has no adequate remedy at law, he is entitled to the equitable relief he seeks").  At the pleading stage, however, Fed.R.Civ.P. 8(d) allows "plaintiffs to plead alternative and even inconsistent theories." Vieira v. First American Title Ins. Co., 668 F.Supp.2d 282, 295 (D.Mass. 2009).  As stated by the First Circuit in Lass, it is therefore an "accepted practice to pursue both theories [unjust enrichment and breach of contract] at the pleading stage."[15]  Lass v. Bank of America, N.A., 695 F.3d

---

[15]  District court "decisions are split as to whether unjust enrichment claims should be dismissed because of corresponding claims at law."  Depianti v. Jan-Pro Franchising Intern., Inc.,

129, 140 (1st Cir. 2012) (quoting <u>Vieira v. First American Title</u> <u>Ins. Co.</u>, 668 F.Supp.2d at 295, in parenthetical); <u>see also</u> <u>Limone v. U.S.</u>, 579 F.3d 79, 93 (1st Cir. 2009) ("plaintiffs had the right to plead alternative theories of liability, <u>see</u> Fed.R.Civ.P. 8(d), and their exercise of that right did not debar them from an independent review of each set of claims"); <u>see</u>, <u>e.g.</u>, <u>Barrett v. H & R Block, Inc.</u>, 652 F.Supp.2d 104, 112 (D.Mass. 2009) (denying motion to dismiss because "Rule 8 permits plaintiffs to plead alternative theories of liability"). Defendants also overlook that the First Circuit vacated the only case they cite to present the argument, <u>Cooper v. Charter Comms,</u> <u>Inc.</u>, 945 F.Supp.2d at 244, because "it is generally permissible to pursue alternative theories at the pleading stage." <u>Cooper v.</u> <u>Charter Communications Entertainments I, LLC</u>, 760 F.3d 103, 113 (1st Cir. 2014) (citing Fed.R.Civ.P. 8(d)).

Accordingly, neither the unjust enrichment claim nor the money had and received claim are subject to dismissal at this stage.

C. <u>Equitable Relief</u>

Defendants maintain that Count VIII for equitable relief is not a cause of action and merely lists a series of remedies that plaintiff requests. Plaintiff submits that the count asks for a declaration that the contract at issue and "all substantively similar contracts are an unconscionable contract of adhesion that" are "unenforceable." (Docket Entry # 14).

---

2014 WL 4145411, at * 28 (D.Mass. Aug. 22, 2014) (collecting cases).

Captioned "Equitable Relief," Count VIII asks for a "declaratory judgment" that the Membership Enrollment form "and all substantively similar contracts are . . . unconscionable contract[s] of adhesion."  (Docket Entry # 9, ¶ 103).  The count additionally seeks to cancel and rescind the Membership Enrollment form as well as an injunction and restitution.

Initially turning to the latter requests, "Restitution is an equitable remedy by which a person who has been unjustly enriched at the expense of another is required to repay the injured party."  Keller v. O'Brien, 683 N.E.2d 1026, 1029 (Mass. 1997). It is not a separate cause of action.  In re DiMare, 462 B.R. 283, 308 (Bkrtcy.D.Mass. 2011) ("restitution is not a cause of action, but an equitable remedy to prevent unjust enrichment"). Likewise, "rescission and reformation are remedies, not causes of action."  In re Bruce, 2012 WL 3133932, at *6 (Bkrtcy.D.Mass. Aug. 1, 2012) (citing Massachusetts law).  The prayer of relief already requests a receivership.  Injunctive relief is also "not a stand-alone cause of action in Massachusetts."  Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 n.3 (1st Cir. 2013). Accordingly, Count VIII is subject to dismissal to the extent it pleads a cause of action for cancellation, rescission, receivership, restitution and/or an injunction.  These forms of relief are nevertheless adequately pled in the prayer of relief. In particular, the prayer for relief in the amended complaint requests "equitable relief including but not limited to rescission, restitution, cancellation, declaratory, disgorgement

41

of profits, receivership, and injunctive." (Docket Entry # 9).

Turning to the request for a declaratory judgment, contracts of adhesion in Massachusetts "are enforceable unless they are unconscionable, offend public policy, or are shown to be unfair in the particular circumstances." McInnes v. LPL Financial, LLC, 994 N.E.2d 790, 798 (Mass. 2013). In determining whether a contract is unconscionable, courts apply "a two-part test to determine 'whether there was "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."'" Vaks v. Ryan, 2014 WL 861455, at *2 (Mass.App.Div. Feb. 28, 2014).

In Count VIII, plaintiff seeks a declaratory judgment that the Membership Enrollment form is unenforceable as an unconscionable contract of adhesion. The Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202, gives a federal court the discretion to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The statute "empowers a federal court to grant declaratory relief in a case of actual controversy." Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530, 534 (1st Cir. 1995); accord Igartua v. U.S., 626 F.3d 592, 634 (1st Cir. 2010) (the statute provides redress for justiciable cases and actual controversies). It is therefore common for parties to seek a declaration of rights regarding coverage under an insurance contract. See, e.g., Narragansett Jewelry Co., Inc. v. St. Paul

42

Fire And Marine Ins. Co., 555 F.3d 38, 39 (1st Cir. 2009).  A
court also has the discretion to declare the rights of the
parties under a licensing agreement, see Western Elec. Co. v.
Hammond, 135 F.2d 283, 286 (1st Cir. 1943), or an employment
contract.  See Nadherny v. Roseland Property Company, Inc., 390
F.3d 44, 47-52 (1st Cir. 2004); see also Verizon New England, Inc.
v. International Broth. of Elec. Workers, Local No. 2322, 651
F.3d 176, 189-190 (1st Cir. 2011).  Likewise, the DJA gives the
court the discretion to declare the rights of parties under a
contract in the event a case or controversy exists and is ripe
for review.  See also Jensen v. Jensen, 2011 WL 2174898 (D.Mass.
June 3, 2011) (adjudicating declaratory judgment count regarding
property rights under an agreement).  Because a request for a
declaratory judgment is a form of relief and not a cause of
action, Buck v. Am. Airlines, Inc., 476 F.3d 29, 33 n.3 (1st Cir.
2007) (explaining that the DJA "creates a remedy, not a cause of
action"), however, it is properly pled in a prayer of relief.
The declaratory relief in paragraph 103a should therefore be in
the prayer of relief section as opposed to in a separate count.
Count VIII is therefore subject to dismissal with the caveat that
paragraphs 103a and 105 shall be included in the prayer of
relief.

D.  The Pederson Settlement

     As a final matter, defendants attach a class action
settlement agreement and an Order of Final Approval and Judgment
("the final order") in Pederson v. Trilegiant Corporation f/k/a

43

Cendant Membership Services, Inc., a Wholly Owned Subsidiary of
Cendant Corporation, Case No. 01 L 1126, to their supporting
memorandum and argue that it bars the present action based on
principles of res judicata, i.e., claim preclusion.  Defendants
submit that plaintiff is a member of the settlement class who did
not opt out of the settlement.  Because the settlement released
Affinion,[16] Trilegiant and Trilegiant's "'Marketing Partners'"
from any claims, defendants assert that the agreement prevents
plaintiff from relitigating the claims in the case at bar.
(Docket Entry ## 13, 20).

    Plaintiff contends there are "Due Process problems" with
enforcing the release against her.  (Docket Entry # 14).  There
are also factual issues about whether she is a class member,
whether the benefit program at issue in this case is a "Product"
within the meaning of the agreement and whether FSA is a
"Marketing Partner" encompassed by the agreement, according to
plaintiff.  (Docket Entry # 14).

    It is appropriate to take judicial notice of the final order
and the settlement agreement incorporated into the final order
(Docket Entry # 13-2, ¶ 2) on a Rule 12(b)(6) motion.  See
Bluetarp Financial, Inc. v. Matrix Construction Co., Inc., 709
F.3d 72, 78 n.4 (1st Cir. 2013) (taking "judicial notice that
neither the South Carolina state-court case or the Maine
state-court case has gone to final judgment"); Ezra Charitable

---

[16]  The settlement agreement defined a "Released Person" to
include "parent companies" of Trilegiant.  Affinion is a parent
company of Trilegiant (Docket Entry # 9, ¶ 6) and therefore a
"Released Person" under the settlement and the final order.

Trust v. Tyco Intern., Ltd., 466 F.3d 1, 9 n.7 (1st Cir. 2006)
(allowing motion "to take judicial notice of the SEC's 2006
complaint against Tyco" filed in district court, "the subsequent
consent decree, and the final judgment").  The final order
released Trilegiant and its "parent companies," i.e., Affinion
(Docket Entry # 9, ¶ 6), from all claims by "all members of the
Settlement Class who [had] not excluded themselves from the
Settlement Class . . . relating to the marketing, sale and/or
purchase of a Product . . .."  (Docket Entry # 13-2).  The final
order approving the settlement defines the "Settlement Class" as:

> All persons and entities who had unsolicited or unauthorized
> charges for Trilegiant products posted to their credit card,
> debit card, phone, bank, mortgage or other billing accounts
> by *Trilegiant or a Marketing Partner* and who paid Trilegiant
> for those products at any time from July 10, 1998, until
> February 15, 2008.

(Docket Entry # 13-2) (emphasis added).  Whether a "Marketing
Partner" of Trilegiant[17] posted the charges to plaintiff's bank
account and whether plaintiff is a member of the class are not
established facts in the Rule 12(b)(6) record.

In addition, the final order defines the term "Products" as
"the membership programs marketed, offered or sold by Trilegiant"

---

[17]   In relevant part, the order defines a "Marketing Partner" as
inter alia "any entity (or any predecessors, successors in
interest of any such entity and any parent company, subsidiary,
or affiliate of such entity) with which Trilegiant has (or
previously had) a contractual relationship whereby the entity"
markets "Products" to the entity's customers or markets or
participates "in the sale of any Product."  (Docket Entry # 13-
2).  The amended complaint notes that Affinion's membership
"programs appear to come from Affinion's marketing partner, in
this case Century Bank . . .."  (Docket Entry # 9, ¶ 33).
Although unlikely, the facts nevertheless plausibly support a
finding that Century Bank is not a marketing partner of
Trilegiant.

or by any "Marketing Partner to consumers offering products, benefits, goods or services to members of the program, and for which Trilegiant and/or a Marketing Partner charges a fee . . .." (Docket Entry # 13-2). The definition broadly extends to "membership products or services marketed or created with Trilegiant that have the same or substantially the same characteristics of these memberships . . .." (Docket Entry # 13-2). Plaintiff attached a listing of Affinion's membership programs to the amended complaint and the list included "the 'Benefits Package' at issue in this Action." (Docket Entry # 9, ¶ 8) (Docket Entry # 9, Ex. C). Affinion's membership programs, however, are not necessarily Trilegiant's membership programs or a Marketing Partner's membership programs. Here again, neither the settlement agreement nor the facts in the amended complaint, including exhibit C (Docket Entry # 9-3), establish that the Membership Enrollment form plaintiff signed is a "Product" within the meaning of the settlement agreement.

Claim preclusion "'generally binds parties from litigating, or relitigating, any claim that was or could have been litigated in a prior adjudication.'" Puerto Ricans For Puerto Rico Party v. Dalmau, 544 F.3d 58, 69 (1st Cir. 2008) (quoting Futura Dev. Corp. v. Centex Corp., 751 F.2d 33, 42 (1st Cir. 1985)). The "three essential elements" of the doctrine are: (1) the identity or privity of the parties to the present and prior actions; (2) the identity of the cause[s] of action; and (3) a prior final judgment on the merits.'" McDonough v. City of Quincy, 452 F.3d

46

8, 16 (1st Cir. 2006).   Whether the doctrine applies depends upon the interpretation and the scope of the settlement agreement and the final order.   See, e.g., Davignon v. Clemmey, 322 F.3d 1, 17 (1st Cir. 2003); see generally South Kingstown School Committee v. Joanna S., 773 F.3d 344, 353 & n.4 (1st Cir. 2014).   Given the legitimately disputed scope of the settlement agreement and the final order, dismissal under Rule 12(b)(6) based on the Pederson settlement is not appropriate.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[18] that defendants' motion to dismiss (Docket Entry # 12) be **DENIED** except for Count III and Count VIII are subject to dismissal with the caveat that paragraph 103a and 105 shall be included in the prayer of relief.

     /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[18]   Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.   See Fed.R.Civ.P. 72(b).   Any party may respond to another party's objections within 14 days after service of the objections.   Failure to file objections within the specified time waives the right to appeal the order.

47